**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                      CR 05-1516 KBM

RAY WESTALL OPERATING, INC.,

        Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court in Las Cruces for a bench trial on January 9, 2006. The Court heard the closing arguments by counsel in Albuquerque on January 26, 2006, has since reviewed its trial notes and the authorities cited by counsel, and now makes the following rulings.

### Findings of Fact

1. Defendant Ray Westall Operating, Inc. ("Westall") is a New Mexico corporation engaged in the production of oil and gas.

2. On or about August 16, 2002, Westall had several evaporation pits at its oil production site in Artesia; the one at issue ("Keohane pit") was approximately seven yards wide and thirty-one yards long.

3. Water produced during the oil extraction process, also known as brine, is pumped into a holding tank and then reinjected into ground located away from the area by means of a transfer pump with a high/low electrical shut-off switch.

4.   If the holding tank reached maximum capacity, the system was designed to have the overflow of water placed in the disposal pit and then allowed to either evaporate to the air or percolate into the surrounding soil.

5.   Oil located in the pit will float on the surface of accumulating water and thereby pose a danger to birds, including some species protected under the Migratory Bird Treaty Act ("MBTA" or "the Act").

6.   Over the pond, Westall constructed a netting made out of ordinary chicken wire approximately 3-4 feet wide and 150 feet long.  The chicken wire sections were secured with hog ring connecters to cover the entire pit and prevent birds from being exposed to any oil hazard.

7.   A barbed wire fence surrounded the pit to keep out livestock.

8.   Each day, Westall's General Manager Donnie Matthews supervises operations of some 60 to 70 oil pumps.

9.   Pumper employees inspected the pits every four to six weeks.

10. Federal Bureau of Land Management ("BLM") employees inspected the pits at approximately two month intervals, and New Mexico Oil Conservation Division ("OCD") employees inspected the pits annually.

11. Although Westall received a citation for an uncovered oil tank in 2000, over  the sixteen years prior to the incident in question, Westall had not received any notice of noncompliance with regulations as to its pits.

12. Sometime in late July or early August 2002, the high/low switch malfunctioned, probably due to an electrical storm, and the overflow water began to accumulate in the evaporative pit.

2

13. It would have taken about a week to ten days for the pit to completely fill (about 2000 gallons of liquid) with the overflow discharge.

14. Unbeknown to Westall, some unknown person removed a six-foot wide section of the wire along the eastern edge of the pit, probably the result of vandalism.

15. The water in the pit rose to a level such that in some areas, the oil sludge "ponded" above the level of the sagging netting.

16. On August 15, 2002, the carcasses of approximately fifty dead birds encased in oil and at various stages of deterioration were discovered in the Keohane pit.  The following day government officials recovered thirty-four intact bird carcasses which were sent for forensic examination and identification.

17. The thirty-four dead birds belonged to species protected by the MBTA.  Specifically, BLM and U.S. Fish and Wildlife employees recovered the remains of ten kingbird, nine orioles, eight western kingbird, two pyrrhuloxia, one blackbird, one meadowlark, one lark bunting, one cactus wren, and one Baltimore or Bullock's oriole.

18. Some of the birds' bodies were located above the chicken wire and some were recovered from underneath the wire netting.

19. A bird carcass would be expected to sink in about four to five days, depending on the depth.

20. During the recovery effort, a bird flew into the pit and was exposed to the oil sludge. Government agents euthanized the bird at the scene.

21. There had been no prior incidents of vandalism at Defendant's pits.

22. Today's OCD best practices call for the use of berming rather than an evaporation pit.

3

23. The Keohane pit no longer exists.

### Legal Analysis

Certain birds migrate from one state to another, indeed even one country to another, without regard to jurisdictional boundaries nor the varying laws humans have put in place that affect them.  In an effort to provide uniform protection for these migratory birds, Congress passed the MBTA in 1918.  It should be noted that unlike the Endangered Species Act ("ESA"), many of the species protected by the MBTA are among the most plentiful and in no danger of extinction.[1]

On the day of trial, Defendant filed a pleading entitled "Memorandum in Support of Motion for Acquittal."  There was no accompanying written motion, but Defendant indicated that the memorandum was intended as support for an anticipated motion for acquittal at the conclusion of the government's case-in-chief.  The essence of the argument goes something like this:  Defendant concedes that the MBTA imposes strict liability for its violation and that therefore, no *mens rea* is required to be proven.[2]  Nevertheless, as to the *actus reus* element,

---

[1]    The list of birds now protected as "migratory birds" under the MBTA is a long one, including many of the most numerous and least endangered species one can imagine.   Although the MBTA initially protected only a small number of birds, in 1971, the Secretary of the Interior expanded its coverage to apply to nearly all birds indigenous to the North America, including the wren, robin, crow, chickadee, oriole, sparrow, warbler, blackbird, bluebird, and many others.  50 C.F.R. § 10.13.

*Mahler v. United States Forest Service*, 927 F. Supp. 1559, 1576 (S.D. Ind. 1996).

[2]    [I]n *United States v. Corrow*, 119 F.3d 796, 805 (10th Cir.1997), *cert. denied*, 522 U.S. 1133, 118 S.Ct. 1089, 140 L.Ed.2d 146 (1998), [we addressed the concept of public welfare offenses] in the context of Migratory Bird Treaty Act misdemeanor violations carrying a potential fine up to $5,000 or imprisonment of not more

4

Defendant contends that the MBTA encompasses only physical acts directed at birds and not those acts that merely have incidental effects on birds.

### *Waiver under FED. R. CIV. P. 12*

The prosecutor first objects to the memorandum citing FED. R. CRIM. P. 12.  *See U.S. v. Corbin Farm Service*, 444 F. Supp. 510, 515, 525 (E.D. Cal. 1978) and *U.S. v. Trammel*, 133 F.3d 1343, 1354 (10th Cir. 1998) (defendant waived his duplicity challenge by failing to object to the indictment until after the jury trial started).  Under Rule 12(b)(3)(B), certain motions must be made before trial including "a motion alleging a defect in the indictment or information."   The Government characterizes Westall's memorandum arguments in just that way.

However, Rule 12  further provides that "at any time while the case in pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." *Id.*  Although this is close case as to whether Defendant has waived arguments regarding the "sufficiency" of the information, Westall's arguments could also be characterized as seeking dismissal for failure to state an offense.  Defendant maintains, and I am inclined to agree, that this issue required some factual development before I could adequately address the arguments.  Therefore, I overruled the Government's objection to the motion insofar as it was based upon timeliness.  The Government has preserved its assertion of error on my part.

### *Analysis on the Merits*

_____

> than six months, or both.   See §16 U.S.C.  707(a) and §18 U.S.C. 3571(b) (raising maximum fine up to $5,000 in 1987).   In *Corrow*, we joined other circuits in holding such offenses are strict liability without a scienter requirement.

*United States v. Unser*, 165 F.3d 755, 763 (10th Cir. 1999).

As to the validity of Defendant's arguments, the Court first looks to the plain language of the statute. The relevant portion of the MBTA provides as follows:

> Unless and except as permitted by regulations made as hereinafter provided in this subchapter, *it shall be unlawful at any time, <u>by any means or in any manner,</u> to* pursue, hunt, *take*, capture, *kill*, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird. . . .

16 U.S.C. § 703 (emphasis added). The sole count of the Information charges that in the course of its oil production operations, Defendant Westall Operating, Inc. "did, without being permitted to do so by regulation as required by law, *<u>take</u>* migratory birds. . . ." *Doc. 1* (emphasis added).

Although the Act itself provides no further definition of "take," the Secretary of the Interior has defined "take" under the MBTA to mean "pursue, hunt, shoot, wound, kill, trap, capture or collect" as well as any attempt to engage in that conduct. *See* 50 C.F.R. § 10.12. Defendant argues that the word "kill" must be read in conjunction with the surrounding words of the definition pursuant to the statutory canon of construction known as *noscitur a sociis. See generally Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995) ("a word is to be known by the company it keeps"), citing *Neal v. Clark*, 95 U.S. 704, 708-09 (1878). If that canon is followed, Defendants believe that under the MTBA, "kill" applies only to conduct aimed at possessing or controlling wildlife. *See Doc. 15*.

Most appellate courts have embraced Defendant's position. In *Newton County Wildlife Ass'n v. U.S. Forest Service*, 113 F.3d 110 (1997), the Eighth Circuit agreed with the Ninth Circuit "that the ambiguous terms 'take' and 'kill' in 16 U.S.C. § 703 mean 'physical contact of

the sort engaged in by hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918.'" *Id.* at 115, citing *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 302 (9th Cir. 1991).[3]  On that basis, the Eighth and Ninth Circuits have held that the MBTA does not preclude the selling of timber that may fall within migratory bird habitats.  *See id.* It should be noted, however, that those decisions were in the context of civil lawsuits seeking injunctive relief.[4]

However, the Second Circuit did uphold an MBTA misdemeanor conviction where the conduct fell outside the realm of poaching or hunting.  In *United States v. FMC Corp.*, 572 F.2d 902 (2nd Cir. 1978), a manufacturer of pesticides unintentionally caused the deaths of migratory birds that came in contact with a contaminated wastewater pond used in its manufacturing

---

[3] *See also, Mahler v. U.S. Forest Service*, 927 F. Supp. 1559 (S.D. Ind. 1996) ("Properly interpreted, the MBTA applies to activities that are intended to harm birds or exploit harm to birds, such as hunting and trapping, and trafficking in birds and bird parts.  The MBTA does not apply to other activities that result in unintended deaths of migratory birds.")

[4] Lower courts have also dealt with the issue in the context of suits to enjoin logging operations. and have reached similar conclusions.

> The words "take" and "kill" were used in a context that clearly focused on hunting, trapping, and poaching.  This context is confirmed by the regulations under the MBTA, which define "to take" in the MBTA as "to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect."  §50 C.F.R. 10.12.  The connection between these words and hunting, trapping, poaching, and trade in birds and their parts is apparent. There simply is no signal in any of these statutory terms that Congress intended the MBTA to be applied to any and all human activity that may result in unintended and accidental deaths of migratory birds (including logging operations).

*Mahler*, 927 F. Supp. at 1579.

process.   There, as it does here, the government argued that MBTA prohibition as to "killing" should be read "without limitation."  *Id.* at 905.  The *FMC* court rejected that position because such a broad ruling could lead to absurd results.

The *FMC* court did find, however, that strict liability criminal prosecutions are appropriate for bird deaths that result from some types of human activities that only indirectly affect protected birds.  Relying on the "extrahazardous activities doctrine," the *FMC* court affirmed the conviction of the manufacturing company for making a highly toxic chemical known to be dangerous to humans and failing to take steps such that the deadly pesticide would not contaminate the pond. *Id.* at 908.  Whether or not the manufacturer knew of the chemical's danger to birds was deemed irrelevant.  *Id.*  Yet the Second Circuit did not draw a bright line for delineating what types of other conduct beyond poaching or hunting ***could*** form the basis for a misdemeanor prosecution.

Just one month before the *FMC* decision, the Chief Judge of the Eastern District of California faced a similar issue.  *See United States v. Corbin Farm Service*, 444 F. Supp. 510 (1978).  In *Corbin Farm*, migratory birds died from eating alfalfa from a field that had been sprayed with a registered insecticide.  As did the *FMC* court, Chief Judge MacBride found that an MBTA misdemeanor conviction could stand when the defendant's dangerous chemicals accidentally poisoned migratory birds.  Focusing on the dangers inherent with using pesticides, the court reasoned that "[w]hen dealing with pesticides, the public is on notice that it should exercise care to prevent injury to the environment and other persons; a requirement of reasonable care under the circumstances of this case does not offend the Constitution."  *Id.* at 536.

Unlike *FMC*, however, *Corbin Farms* seems to indicate that a negligence standard should be imposed rather than strict liability when the conduct underlying the MBTA violation is not

8

directed at birds.[5]  Chief Judge MacBride cautioned that "[i]f defendants acted with reasonable care or if they were powerless to prevent the violation, than a very different question would be presented."  *Id.*  Here, Defendant Westall argues that strict liability cannot be imposed because their oil pit operations were not directed at the birds and do not constitute "extrahazardous" activities.  But even if I were to find that the *Corbin Farm* rationale applied here, Defendant maintains that it exercised reasonable care to assure the safety of migratory birds and that the actions of others are responsible for the birds' demise.

In response, the prosecution argues that the statute's phrase "by any means or in any manner" means just that, and the government relies on *United States v. Moon Lake Elec. Ass'n*, 45 F. Supp.2d 1070, 1079 (D. Colo. 1999).  In *Moon Lake*, District Judge Babcock pronounced, "I do not regard the following language as vague or ambiguous: 'it shall be unlawful at any time, by any means or in any manner, to . . . kill . . . any migratory bird.'"  *Id.*, *quoting* 16 U.S.C. § 703.  How then can there be a principled distinction between activities directed at bird and those indirectly affecting birds?

In the absence of ambiguity, there is no apparent need to resort to maxims of statutory construction as to the agency's use of the word "kill" in its definition of "take" or any reason to explore the Act's legislative history.  Yet Judge Babcock continued on to thoroughly address both of these matters.

Legislative history provides no clear insight as to congressional intent.  The *Moon Lake*

---

[5]  Westall contends that the Ninth Circuit's later decision in *Audubon* effectively overruled *Corbin Farm*'s finding that the MBTA covers conduct beyond that engaged in by hunters and poachers.  *See Seattle Audubon Soc'y v. Evans*, 952 F.2d 297 (9th Cir. 1991).  However, the *Audubon* court specifically found the reasoning of the *FMC* and *Corbin Farm* decisions to be "inapposite" since those case did not deal with "habitat destruction."  *Audubon*, 952 F.2d at 303.

opinion describes in great detail the MBTA's legislative history, so I will not repeat it here.  *See id.* at 1079-82.  Some aspects of the history reflect the Act was only "intended to regulate recreational and commercial hunting." *Id.* at 1080.  Yet other portions of the history indicate that conduct beyond hunting or poaching was intended to fall within the Act's proscriptions.  Most telling is the fact that many of the protected species under the MBTA are ***not*** considered game birds. *Id.* at 1081.  Suffice it to say that I, like Judge Babcock, find that "the legislative history of the MBTA supports differing interpretations."  *Id.* at 1082.

      As to statutory construction, Judge Babcock rejected the position that "take" as defined by the Secretary of the Interior in 50 C.F.R. § 10.12 was restricted to activities purposefully directed at birds.  *See Moon Lake*, 45 F. Supp.2d at 1072-1079.  In doing so, Judge Babcock relied on the Supreme Court's decision in the *Babbitt v. Sweet Home* case cited above that dealt with the Endangered Species Act ("ESA").  Defendant contends that such reliance was misplaced.

      The ESA defines "take" as used in that legislation to include "harass, harm, pursue, hunt, shoot, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The Secretary of the Interior defined "harm" as used in the EPA to include indirect acts which result in actual death or injury to protected wildlife including habitat modification and degradation.  50 C.F.R. § 17.3 (1994).  In the *Babbitt* case, the Court of Appeals for the District of Columbia reasoned that the term "harm" must be read in conjunction with the other terms used in the statute to define "take."  *Babbit*, 17 F.3d 1463.  Applying the *noscitur a sociis* doctrine of statutory construction, the Court of Appeals held that "harm" applied only to "the perpetrator's direct application of force against the animal taken. . . ."  *Id.* at 1465.

      The Supreme Court reversed, and held that the Secretary of Interior's interpretation of

10

"harm" in the ESA is reasonable.  Among other things, the *Babbitt* Court found that the ordinary understanding of the word "harm" encompassed activities both directed against and those indirectly affecting an endangered species.  *Babbitt*, 515 U.S. at 2413.  The Court noted that any other interpretation resulted in the term "harm" as having "no meaning that does not duplicate the meaning of other words that § 3 uses to define 'take'."  *Id.*

In *Moon Lake,* Judge Babcock noted that activities such as habitat modification or degradation were not at issue, and therefore the *Babbitt* case was "factually inapposite."  *Moon Lake*, 45 F. Supp.2d at 1077.  However, he decided that in interpreting the MBTA, "the Supreme Court's method of analyzing legislative language is instructive."  *Id.* at 1078.

Defendant Westall argues that Judge Babcock incorrectly relied on the Supreme Court's opinion regarding the term "harm"  when he concluded that the MBTA includes indirect activities that kill migratory birds.  Unfortunately, the *Moon Lake* opinion does quote extensively from that section of the Supreme Court's opinion in *Babbitt* discussing the term "harm" in the context of the ESA.  *See id.* at 1078-79.  Yet as Defendant correctly observes, unlike the ESA, the MBTA does not prohibit "harm" to wildlife.  I disagree, however, that Judge Babcock relied on the Court's definition of "harm" in *Babbitt* in reaching his decision.

*Moon Lake*'s rationale instead rested on *Babbitt's* premise that every word of a statute should, if possible, be given effect.  *See Babbitt*, 515 U.S. at 697-97; *see also Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837 (1988) ("we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").  Indeed, the Supreme Court  has cautioned "that when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd –

11

is to enforce it according to its terms."  *Lamie v. United States Trustee*, 540 U.S. 526, 534

(2004) (original quotations and citations omitted).

Judge Babcock strove to give the word "kill" some meaning independent of the other

prohibited activities to avoid finding the term "kill" to be mere surplusage.  *Moon Lake*, 45 F.

Supp.2d at 1079.  He therefore concluded that the prohibited acts under the MBTA must include

activities beyond poaching or hunting that cause the death of migratory birds to confer any

independent meaning to "kill."  *See id.* at 1079 ("to hold otherwise would. . . essentially read that

word out of the MBTA and the Secretary's definition of take.")

Of course, "[t]he canon requiring a court to give effect to each word '*if possible*' is

sometimes offset by the canon that permits a court to reject words 'as surplusage' if 'inadvertently

inserted or repugnant to the rest of the statute. . . .'"  *Chicksaw Nation v. United States*, 534 U.S.

84 (2001), *quoting* K. Llewellyn, The Common Law Tradition 525 (1960).  Defendant Westall

argues that such repugnancy is demonstrated by the absurd results that could result if the MBTA

imposes criminal penalties for activities not directed at migratory birds that unintentionally cause

their death.

> Under the absurdity doctrine, a court should adhere to a statute's plain
> meaning unless doing so would produce absurd results. Courts should
> invoke this "absurdity exception" to the plain meaning rule under only the
> most extraordinary circumstances.  The Supreme Court has observed that it
> "rarely invokes [an absurd results test] to override unambiguous
> legislation."  *Barnhart v. Sigmon Coal Company*, 534 U.S. 438, 460, 122
> S.Ct. 941, 955, 151 L.Ed.2d 908 (2002).  A leading treatise on statutory
> construction explained that "the absurd results doctrine should be used
> sparingly because it entails the risk that the judiciary will displace legislative
> policy on the basis of speculation that the legislature could not have meant
> what it unmistakably said."  2A Norman J. Singer, Statutes and Statutory
> Construction § 46:07 (6th ed.2000).

*United States v. Rudolph*, 224 F.R.D. 503, 507 n.18 (N.D. Ala. 2004)

The Government concedes, and Judge Babcock acknowledged, the possibility of absurd results with *Moon Lake*'s interpretation of the MBTA.  Indeed, the *FMC* opinion warned that a statutory construction which "would bring every killing within the statute, such as deaths caused by automobiles, airplanes, plate glass modern office buildings or picture windows in residential dwellings into which birds fly, would offend reason and common sense." *See FMC,* 572 F.2d at 905.[6]

What, then, assures that absurd results will not flow from imposing liability for unintended bird deaths resulting from "indirect takings"?  The Second Circuit trusted in "the sound discretion of prosecutors and the courts." *FMC*, 575 F.2d at 905.  I, like others, find little solace in that answer.  Indeed, "for many defendants who may well be quite law-abiding, the significance of having *any* federal criminal conviction cannot be diminished  by the fact that the penalties are not terribly severe." *Mahler*, 927 F. Supp. at 1582-83.  Moreover, the possibility of six months in prison seems much more than a *de minimus* penalty to me.  *See* 16 U.S.C. § 707 (a) (maximum fine of $15,000 and/or imprisonment up to 6 months).

Like Judge Babcock, "I agree that courts should not rely on prosecutorial discretion to ensure that a statute does not ensnare those beyond its proper confines." *Moon Lake*, 45 F. Supp at 1084.  I, too, am loathe to construe a criminal statute in such a way that society must "depend

---

[6]    In fact, these are everyday occurrences.  *See* Larry Martin Corcoran, Migratory Bird Treat Act: Strict Liability for Non-Hunting, Human Caused Deaths, 77 Denv. U. L. Rev. 315 (1999).  One study estimates that cats are responsible for the death of 38.7 million birds per year in Wisconsin alone.  *Id.* at n. 203.  Indeed, over the years, my pet poodle brought me more gifts of bird carcasses than I dare remember.  At closing arguments I asked counsel if I could be prosecuted for allowing him outside under the government's killing "by any means or in any manner" theory of liability.  For a moment, I could have heard a pin drop.

on the good will of those who enforce it" to assure that no absurd results occur.  *Id.*

In the *Moon Lake* opinion, Judge Babcock instead looks to the principles of "proximate

causation" to provide protection from absurd results.  *Id.* at 1085.  In *Babbitt*, the majority stated

> We do not agree with the dissent that the [ESA] regulation covers results
> that are not "even foreseeable. . . no matter how long the chain of causality
> between [the act] and injury."  Respondents have suggested no reason why
> either the "knowingly violates" or the "otherwise violates" provision of the
> "harm" regulation itself should not be read to incorporate ordinary
> requirements of proximate causation and foreseeability.

*Babbitt*,  515 U.S. at 697 n.9 (citation omitted).  Indeed, Justice O'Connor's concurrence in

*Babbitt* reasoned, "It is not hard to imagine conduct that, while 'indirect' (i.e., nonpurposeful),

proximately causes actual death or injury to individual protected animals; indeed, principles of

proximate cause routinely apply in the negligence and strict liability contexts."  *Babbitt*, 515 U.S.

711 n* (O'Connor, J. concurring)(citation omitted).

Moreover, Justice O'Connor recognized that the absence of a scienter requirement did not

automatically impose liability for harms resulting from an indirect activity.

> Strict liability means liability without regard to fault;  it does not normally
> mean liability for every consequence, however remote, of one's conduct.
> *See generally* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and
> Keeton on Law of Torts 559-560 (5th ed. 1984) (describing "practical
> necessity for the restriction of liability within some reasonable bounds" in
> the strict liability context).   I would not lightly assume that Congress, in
> enacting a strict liability statute that is silent on the causation question, has
> dispensed with this well-entrenched principle.

*Id.* at 712 (O'Connor, J. concurring).  In the context of the MBTA, I agree with the *Moon Lake*

rationale and will likewise look to the principles of proximate causation in avoiding absurd results.

In summary, I find the plain language of both the Act and its implementing regulations to

14

be clear and unambiguous.  As Defendant acknowledges, the MBTA imposes strict liability.  Yet to determine whether an activity is "directed" at birds, one must necessarily look to the purpose, aim or "intent" in performing the act.  Defendant's proposed reading of the MBTA would graft a "*mens rea*" requirement onto the "*actus reus*" element of the crime that, in essence, would amount to an "end run" around strict liability.  Therefore, I find that the terms "take" and "kill" do not limit themselves to direct applications of force purposefully directed at birds, and will look to proximate causation for protection against absurd results.[7]

### Conclusions of Law

Under the MBTA, Defendant Ray Westall Operating, Inc. is strictly liable for the deaths of the migratory birds recovered from the Keohane pit on August 16, 2002 if the element of proximate causation is demonstrated by the government beyond a reasonable doubt.  I am persuaded that the birds were ***actually*** caused by the pooled oil, and now I must now determine if the actions or inactions of Defendant Westall ***proximately*** caused the deaths.

Again, in the context of the ESA, Justice O'Connor reviewed the principle of proximate causation.

> Proximate causation is not a concept susceptible of precise definition.  It is easy enough, of course, to identify the extremes.  The farmer whose fertilizer is lifted by a tornado from tilled fields and deposited miles away in a wildlife refuge cannot, by any stretch of the term, be considered the proximate cause of death or injury to protected species occasioned thereby.  At the same time, the landowner who drains a pond on his property, killing

---

[7]  I should note that all of the above approaches including my own have been subject to some criticism.  *See e.g.,* Corcoran, *Migratory Bird Treaty Act*, *supra*, at 355 (arguing for an administrative solution: "An intellectually honest, and reasonably objective basis for distinguishing appurtenances of modern society cannot be found in theories of proximate causation, impossibility, good faith or due care, etc.  In addition, the efforts of the courts to fashion such a limitation is an undemocratic interference in the processes of representative government.").

> endangered fish in the process, would likely satisfy any formulation of the
> principle. We have recently said that proximate causation "normally
> eliminate the bizarre," and have noted its "functionally equivalent"
> alternative characterizations in terms of foreseeability and duty. Proximate
> causation depends to a great extent on considerations of fairness of
> imposing liability for remote consequences. The task of determining
> whether proximate cause exists in the limitless fact patterns sure to arise is
> best left to the lower courts.

*Babbitt*, 515 U.S. 713 (O'Connor, J. concurring) (quotations and citations omitted).

There is no question in my mind that Defendant was aware of the dangers posed by the oily sludge. At trial, expert testimony was received on the subject, and common knowledge of oil spills such as the Exxon Valdez disaster in Alaska make oil a known danger to birds. *See also generally*, Corcoran, *Migratory Bird Treaty Act*, *supra* (Part VII - "Bird Deaths Caused by Instrumentalities of Modern Civilization. . ."). Moreover, the prosecution here offered evidence of a prior notice of non-compliance when migratory birds killed in an exposed oil storage tank. I have considered this evidence only for the purpose of demonstrating defendant's knowledge of the potential harm and for no other purpose. *See* FED. R. EVID. 404(b). It is undisputed that the netting was specifically designed and erected to prevent birds and other livestock from having access to the Keohane pit.

It was also foreseeable that a failure to adequately maintain the netting would expose the migratory birds to the oily substance and thereby likely lead to their demise. True, Defendant operated over a decade and a half without any notices of noncompliance with regard to their oil pit operations, and that time period included both scheduled and unscheduled inspections by Westall's pumpers and other regulatory agencies.

Defendant argues that it should not be found guilty because a series of remote and

unforeseeable events – the electrical storm about two weeks before bird carcasses were noticed, the resulting malfunction of the high/low switch causing water to drain into the pit, and damage from vandalism – came together to cause the tragedy.  In my mind, the question boils down to whether and resulting injury to the migratory birds was sufficiently foreseeable and avoidable to hold Westall accountable.

True, there was no evidence of past incidents of vandalism occurring at the Keohane pit. Nevertheless, with the known dangers posed by the pit, I cannot say that Westall's practice of inspecting a pit only once every four to six weeks served as adequate protection against the foreseeable dangers that such vandalism can create if it occurs.  Ultimately, I determine that these traumatic bird death were foreseeable and avoidable with more frequent inspections, and that strict liability is therefore appropriate.

I find Defendant Ray Westall Operating, Inc. guilty of the Class A misdemeanor as charged in the Indictment.  Information will be provided by Defendant to a Probation Officer for preparation of a pre-sentence report.  After having reviewed the PSR, Defendant's counsel can file objections prior to the sentencing hearing.  Sentencing will be scheduled upon the Court's receipt of the PSR.

_____
UNITED STATES MAGISTRATE JUDGE